[No. 32262-1-I.   Division One.   April 4, 1994.]

KEVIN TENNYSON, ET AL, *Appellants*, v. PLUM CREEK TIMBER CO., ET AL, *Respondents*.

Kᴇɴɴᴇᴅʏ, J., dissents in part by separate opinion.

*Eugene M. Moen* and *Chemnick, Moen & Greenstreet,* for appellants.

*J. Thomas Richardson* and *Cairncross & Hempelmann, P.S.; Bertil F. Johnson* and *Davies Pearson, P.C.; Walter G. Meyer* and *Meyer, Fluegge & Tenney; James S. Berg* and *Halverson & Applegate, P.S.,* for respondents.

COLEMAN, J. — Kevin Tennyson appeals the trial court's grant of summary judgment in favor of Plum Creek Timber Co., C. Wyss & Son, Inc., Blue Dot Excavating, Inc., and Lumsden Logging, Inc., "the contractors". Tennyson contends that (1) the altered gravel mound was "latent" as a matter of law under RCW 4.24.210,[1] (2) the contractors may not claim immunity under RCW 4.24.210, and (3) the completion and acceptance doctrine does not relieve the contractors from liability. We affirm.[2]

On August 4, 1991, Tennyson was injured while riding his off-road motorcycle on land owned by Plum Creek Timber Company. The injuries occurred when Tennyson fell after driving his motorcycle up a large gravel mound that had been substantially excavated on the other side.

Tennyson had ridden his motorcycle on the same mound 14 months before the accident. He alleges that, as he approached the pile from the northwest, it appeared to be in the same condition as earlier. There was still a trail going up the northwest face of the mound. However, when he reached the top of the mound he realized something was different and he attempted to stop. His motorcycle came to a stop at the edge of the drop-off, but his front wheel broke through the edge and he tumbled down the hill, receiving serious personal injuries.

---

[1]Former RCW 4.24.210 provided in part:

"Any public or private landowners or others in lawful possession and control of any lands whether rural or urban, or water areas or channels and lands adjacent to such areas or channels, who allow members of the public to use them for the purposes of outdoor recreation . . . without charging a fee of any kind therefor, shall not be liable for unintentional injuries to such users: . . . Provided . . . That nothing in this section shall prevent the liability of such a landowner or others in lawful possession and control for injuries sustained to users by reason of a known dangerous artificial latent condition for which warning signs have not been conspicuously posted[.]"

[2]In determining whether an order of summary judgment has been properly entered, this court engages in the same inquiry as the trial court and views all evidence in the light most favorable to the nonmoving party. Summary judgment will only be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Rhea v. Grandview Sch. Dist. JT 116-200*, 39 Wn. App. 557, 559, 694 P.2d 666 (1985).

In the period between when Tennyson last rode over the mound and the day of the accident, over one-half of the mound had been removed on the southeast side. The result was a sharp drop-off from the top of the mound along the southeast side. There were no warning signs at the site; however, the drop-off was clearly visible from all other directions except the northwest direction from which Tennyson approached.

We first determine whether the excavation constituted a latent condition, thereby subjecting Plum Creek to liability under RCW 4.24.210.

The recreational land use statute, RCW 4.24.210, limits landowners' liability for injuries occurring on their property. Landowners, however, remain liable for injuries caused by "a known dangerous artificial latent condition". The purpose behind this limitation of liability is to encourage landowners to open their land to the public for recreational use. RCW 4.24.200.

In *Van Dinter v. Kennewick*, 64 Wn. App. 930, 931, 827 P.2d 329 (1992) (*Van Dinter* I), *aff'd*, 121 Wn.2d 38, 44, 846 P.2d 522 (1993) (*Van Dinter* II),[3] the appellant was injured by a protruding metal antenna attached to a caterpillar-shaped piece of playground equipment. The appellant did not dispute that the antenna was obvious but argued that the City should have anticipated that "persons using the park in the expected manner—running and playing—would have their attention distracted and would not discover the obvious." *Van Dinter* I, at 936.

Analyzing RCW 4.24.210, the court concluded that the landowner (the City of Kennewick) was immune from liability. The court distinguished landowners' liability under the statute from landowners' liability under the common law, stating:

> [A]bsent RCW 4.24.210, the landowner is liable for injuries caused by an obvious condition of his land which he should

---

[3]Throughout this opinion, we distinguish between the Court of Appeals' decision and the Supreme Court's decision by using the names *Van Dinter* I and *Van Dinter* II.

expect the invitee will not discover because of the circumstances surrounding his use of the property. *If we were also to interpret RCW 4.24.210 to provide for landowner liability for injuries caused by patent conditions which the owner should expect the user not to discover, we would effectively convert recreational users back to their common law status as public invitees.* Such an interpretation would defeat the purpose of RCW 4.24.210[.]

(Italics ours.) *Van Dinter* I, at 935. Thus, the court concluded, the statute "immunizes the City from liability for injuries caused by obvious conditions, even if the plaintiff reasonably failed to discover the danger." *Van Dinter* I, at 936.

In *Van Dinter* II, the Supreme Court affirmed the Court of Appeals, using a different analysis. The court determined that the scope of the "condition" for purposes of the statute included the caterpillar's placement in the park — specifically, its proximity to the grassy area, as well as the antenna itself. *Van Dinter v. Kennewick*, 121 Wn.2d 38, 44, 846 P.2d 522 (1993).

The court then addressed Van Dinter's argument that the City should be liable because although the condition itself was patent, the danger it posed was latent. The court rejected this argument, stating that "RCW 4.24.210 does not hold landowners potentially liable for patent conditions with latent dangers. The condition itself must be latent." *Van Dinter* II, at 46. The court then concluded that although it may not have occurred to Van Dinter that he could injure himself the way he did, the proximity of the caterpillar to the grassy area was obvious and the dangerous condition was therefore not latent. *Van Dinter* II, at 46, 47.

In *Gaeta v. Seattle City Light*, 54 Wn. App. 603, 774 P.2d 1255, *review denied*, 113 Wn.2d 1020 (1989), the appellant was riding his motorcycle on a roadway across the Diablo Dam that had specialized rail tracks on one side. He did not notice the tracks until he was between them. As he tried to steer his motorcycle out from between the tracks, his wheel lodged in a groove next to one of the tracks, and the appellant was injured. *Gaeta*, at 605-06. Despite the fact that the

appellant had not noticed the tracks, the court concluded that the tracks were obvious. *Gaeta*, at 610.

Here, Tennyson claims that the excavation was not obvious to him and that "latency may well depend on the vantage point of the recreational user." Reply Br. of Appellant, at 4. He also argues that this court can affirm the summary judgment only if it concludes that "no reasonable juror could conclude that Kevin Tennyson acted reasonably in riding up the well-marked path on the northwest slope of the gravel mound".

██ █ We disagree. Under the case law, what a particular recreational user reasonably did or did not see has no bearing on whether a condition is latent. In *Van Dinter* I, the appellant's primary argument was that the caterpillar's antennae were not apparent to a person using the park in the expected manner, *i.e.*, running and playing. *Van Dinter* I, at 936. Rejecting this argument, the court specifically stated that under RCW 4.24.210, landowners should not be held liable for injuries caused by undiscovered patent conditions. *Van Dinter* I, at 935. Although in *Van Dinter* II, the Supreme Court relied on a different analysis and did not reach the arguments addressed in *Van Dinter* I, the Supreme Court did not disagree with or overrule the Court of Appeals' reasoning.

██ In addition, in *Gaeta*, the appellant did not discover the tracks until he was between them. Nonetheless, without concluding that the failure to notice the tracks was unreasonable, the court held that the condition was not latent. *Gaeta*, at 605, 610. Thus, as demonstrated by *Van Dinter* I and *Gaeta*, the reasonableness of a particular recreational user's failure to discover a condition has no bearing on whether the condition is latent. We believe that the dispositive question is whether the condition is readily apparent to the general class of recreational users, not whether one user might fail to discover it.

In the present case, the excavation was considerably larger and more conspicuous than either the antennae in *Van Dinter* I or the tracks in *Gaeta*. As the trial court noted, the excavation was in plain view and readily apparent to

anyone who examined the gravel mound as a whole. The fact that some recreational users, *i.e.*, those who approach from the northwest and ride up the mound without checking the other side, might fail to discover the excavation does not render it latent within the meaning of the statute.

As the *Van Dinter* I court pointed out, allowing liability "for injuries caused by patent conditions which the owner should expect the user not to discover . . . would effectively convert recreational users back to their common law status as public invitees." *Van Dinter* I, at 935, We believe that under the statute, a landowner is not required to anticipate the various ways that people might use its property, nor is a landowner required to predict possible scenarios in which a user might fail to see a patent condition. Thus, we conclude that the statute relieved Plum Creek from the burden of anticipating that someone might attempt to ride up the mound from the northwest side without examining it.[4] The trial court correctly concluded that the excavation was not a latent condition within the meaning of the statute.

We next address whether the trial court erred by applying the immunity of Washington's recreational land use statute to the contractors.

RCW 4.24.210 applies if a person in lawful possession and control of lands allows the public to use them for recreational purposes without charging a fee. Here, the contractors argue that they are entitled to immunity under the statute because they had lawful possession and control of the land at the time the alleged negligent acts occurred. We disagree.

---

[4]To support his claim that the excavation was latent, Tennyson analogizes the excavation to a pit in a road which cannot be seen by drivers approaching from one side due to a curve in the road. However, the excavation in the present case differs from Tennyson's analogy in that this was not a situation where the condition was unexpected.

The record reflects that Tennyson knew that the gravel pile was a stockpile and that gravel could be removed at any time. The fact that Tennyson knew the gravel pile was subject to change supports our determination that the condition was not latent and demonstrates the logic of the approach we have adopted.

In *Labree v. Millville Mfg., Inc.*, 195 N.J. Super. 575, 481 A.2d 286 (1984), a subcontractor and a landowner entered into an agreement that allowed the subcontractor to excavate gravel and sand from the land "to the extent necessary" to construct a nearby road. The excavation resulted in the creation of a lake, which was used by the public for swimming. Several years after the excavation was completed, the plaintiff was injured when he dived into the water and hit his head on a submerged obstruction. *Labree*, at 579.

On appeal, the court interpreted a statute that immunized an "owner, lessee, or occupant" from liability for injuries incurred by recreational users of the land.[5] The court noted the general rule that immunity is not favored in the law and that statutory grants of immunity should be strictly construed. The court then determined that the word "occupant" as used in the statute was intended "to provide immunity for an entity with a degree of permanence in the occupancy, not merely one who is using the property, as was the case with [the subcontractor]." The court also emphasized that the subcontractor's license to use the land was limited to the purposes specified under the contract. *Labree*, at 583.

■ We believe that the reasoning in *Labree* applies to the present case. The "possession and control" requirement clearly indicates a broader, more permanent interest in the land than was present here. As in *Labree*, the agreements between Plum Creek and the contractors were for purposes of excavation. There is no evidence that the contractors' activities went beyond those specified in their agreements.

In addition, as in *Labree*, these limited contractual rights expired when the contractors completed their work, which

---

[5]The New Jersey statute provides in part:

"a. An owner, lessee or occupant of premises, whether or not posted as provided in section 23:7-7 of the Revised Statutes, owes no duty to keep the premises safe for entry or use by others for sport and recreational activities, or to give warning of any hazardous condition of the land or in connection with the use of any structure or by reason of any activity on such premises to persons entering for such purposes[.]" *Labree*, at 289 (quoting N.J. Stat. Ann. § 2A:42A-3 (West 1987) (amended 1992)).

was many months prior to Tennyson's accident.[6] The record indicates that the contractors went onto the property for the purpose of fulfilling contractual obligations and left after these obligations were met. Under these circumstances, the contractors had no continuing authority to determine whether the land should be open to the public, and extending immunity to them would not further the purpose behind the act, which is to encourage landowners to open their land by limiting their liability. Therefore, we decline to extend immunity under RCW 4.24.210 to the contractors.

Finally, we address whether the contractors are immune from liability under the doctrine of completion and acceptance.

■ The completion and acceptance doctrine operates as a defense to contractor liability. The rule has been phrased as follows:

> [W]here the work of an independent contractor is completed, turned over to, and accepted by, the owner, the contractor is not liable to third persons for damages or injuries subsequently suffered by reason of the condition of the work, even though he was negligent in carrying out the contract[.]

*andrews v. Del Guzzi*, 56 Wn.2d 381, 388, 353 P.2d 422 (1960) (recognizing doctrine but finding contractors liable under exception for inherently or imminently dangerous conditions) (quoting 65 C.J.S. 613); *Donaldson v. Jones*, 188 Wash. 46, 50, 61 P.2d 1007 (1936) (recognizing the doctrine of completion and acceptance as the "well settled" general rule); *Axland v. Pacific Heating Co.*, 159 Wash. 401, 406, 293 P. 466 (1930) (recognizing general rule but finding that condition fell within exception).

We recognize that the completion and acceptance doctrine has been criticized.[7] However, in Washington the doctrine

---

[6]The last contractor to excavate, Blue Dot Excavating, removed gravel in mid-October 1990, nearly 10 months prior to Tennyson's accident.

[7]For example, 41 Am. Jur. 2d *Independent Contractors* § 50 (1968) provides in part: "[I]t is now the generally accepted view that . . . a contractor is held to the standard of reasonable care for the protection of third parties who may foreseeably be endangered by his negligence, even after acceptance of the work by the contractee, and the early theory that lack of privity of contract between

has continuing validity, and we conclude that it is applicable to the present case. In each instance, the contractor completed the work, which was then turned over and accepted by Plum Creek. This occurred substantially prior to the incident involving Tennyson. Accordingly, we affirm the trial court on this issue.[8]

The order of the trial court is affirmed.

WEBSTER, C.J., concurs.

KENNEDY, J. (dissenting in part) — I respectfully dissent from the majority's conclusion that the dangerous condition in this case is patent as a matter of law.[9] In order to clarify the basis of my disagreement, I must state some additional facts not mentioned by the majority. Most of these additional facts are undisputed; a few are disputed; all must be viewed in the light most favorable to Tennyson, for the purposes of this review. *Sea-Pac Co. v. United Food & Comm'l Workers Local Union 44*, 103 Wn.2d 800, 802, 699 P.2d 217 (1985).

## FACTS

Plum Creek Timber Company (Plum Creek) owns 3,000 acres of land located in the vicinity of three towns in Kittitas County: Cle Elum, Roslyn and Ronald. All of this land is open

the contractor and the injured third person was a valid defense no longer prevails." (Footnotes omitted.)

[8]Implicitly within this holding is also a rejection of Tennyson's and Plum Creek's argument that the inherent or imminent danger exception should apply. This exception was recognized by the four dissenters in *andrews v. Del Guzzi, supra*, who stated: "Items which qualify as exceptions to the general rule have been limited by the courts to those having known dangerous propensities, such as dynamite, gunpowder, dynamite caps, and firearms." *andrews*, at 392 (Ott, J., dissenting). A gravel pile, unlike dynamite, gun powder, or other flammable or explosive materials, does not have a known dangerous propensity.

[9]I fully concur with the majority opinion that the three independent contractors are not immune under the recreational land use act but that they are immune by virtue of the doctrine of completion and acceptance, to which this court is currently bound by virtue of the rulings of our Supreme Court. Accordingly, I would reverse and remand for a trial on the merits, but only as to Plum Creek Timber Company.

to public recreational use, free of charge. On any given weekend from April to October in 1990 and 1991, some 2,000 dirt bikers could be found in the vicinity of the gravel mound. Before the excavation of the southeast end of the mound, literally hundreds of dirt bikers were accustomed to riding up and over the northwest end of the mound and back down to ground level on the southeast end of the mound.

The gravel mound as originally constructed was rectangular in shape. It was 266 feet long on its longest, easterly and westerly sides, and 20 feet tall. It held 12,000 cubic yards of well-compacted gravel and dirt. It was flat on top. Its sides sloped inward and upward at about a 45 degree angle — flatter, however, than that at the northwesterly end. By 1990 when Tennyson first rode on the mound, weeds and grasses grew sparsely over the surfaces of the mound.

For its own business purposes, Plum Creek had built a network of gravel and dirt roads leading into, over and through its 3,000 acres of land. Dirt bikers made free use of these roads. People coming onto the property from Cle Elum and traveling to the area of the gravel mound for business or recreational purposes most often arrived at the mound from the southeast, using one of Plum Creek's private roads, in that this was the most direct route to the mound from Cle Elum. Tennyson approached the mound from the southeast on Memorial Day weekend of 1990, the date of his first visit to the mound.

However, it was also possible to reach the mound from the opposite direction on that same roadway, as did Tennyson and five of his friends on August 4, 1991. Tennyson had come onto the property from Roslyn/Ronald in August 1991, rather than from Cle Elum. Plum Creek did not restrict its recreational users to any particular route into or out of its property, or to any particular route to and from the gravel mound.[10]

---

[10]A portion of the Roslyn town limits borders on a perimeter of Plum Creek's 3,000-acre site. Although signs were posted discouraging dirt bikers whose vehicles were not licensed and equipped for public-street use from straying onto the streets of Roslyn, recreational users were not restricted from entering Plum Creek's property from the streets of Roslyn.

It is undisputed that dirt bikers who arrived at the mound from the southeast, following the excavation which was done in October 1990, could clearly see that the southeast end of the mound had been excavated away and that the excavation ended in a sheer, man-made cliff with a 20-foot vertical drop. As to riders arriving from the southeast, there can be no question that this condition was patent. It is equally clear from the record that dirt bikers arriving at the mound on this same roadway but from the northwest could not see the man-made cliff unless and until they continued far enough along that same roadway, which runs parallel to the easterly, long side of the rectangular mound, to enable them to view the mound in profile from its broad side.[11] This is so even though the mound, which had originally been some 266 feet long on its easterly and westerly sides, was reduced by the excavation to a rectangle with long sides of some 136 feet.

Gary Sloan, Ph.D., a psychologist who obtained his Ph.D. degree in ergonomics with a minor in industrial engineering, and who specializes in human factors and ergonomics, explained why this is so in a declaration prepared for the summary judgment proceeding.[12] There were no visual cues from the northwest end of the mound to give a dirt bike rider, and particularly a rider who had safely ridden on the mound before the excavation was done, any indication that the southeast end of the mound now ended in a steep man-made cliff. The coloration of the mound provided very little contrast to the background. A well-worn trail, made by literally hundreds of dirt bikers, led directly from the roadway at the northwest end of the mound to the mound itself and

---

[11]In this sense, the majority correctly states that the drop-off at the southeast end of the mound was clearly visible from three of its four sides. Majority, at 553.

[12]Dr. Sloan's credentials are included in the record. He clearly could qualify to give expert opinion testimony based on his training, education, professional experience and investigation of this accident. Dr. Sloan reviewed all the depositions and declarations which are contained in the record for this appeal. He also visited the gravel mound, made observations and took extensive photographs and measurements before formulating his opinion. His declaration and credentials are found in the Clerk's Papers, at pages 466-76, inclusive.

then continued up and over the mound.[13] It was this well-worn trail that Tennyson followed on the day of his accident. See the appendix to this dissenting opinion — a photocopy of two photographs of the mound which depict what Tennyson would have seen as he approached the mound on August 4, 1991. The overall appearance of the mound when viewed from its northwest end, including the well-marked trail and the amount of vegetation on the mound, was unchanged between Memorial Day 1990, when Tennyson first rode there, and August 4, 1991, the day of his fall.

Given predictable human behavior, Dr. Sloan opines that a rider such as Tennyson who had ridden safely on the mound before would likely expect that he could ride safely on the mound again because there were no visual cues to alert him that the mound had been so drastically changed at its southeast end. Riders who are totally unfamiliar with the terrain they are traveling through will probably focus on the part of the trail that is 2 to $2^1/2$ seconds ahead of them, so that they will have sufficient time to make complex decisions, such as turning around or heading in another direction. Bike riders who are familiar with the area in which they are riding are more likely to focus on that portion of the trail which is 1 to $1^1/2$ seconds ahead of them, so that if they see a rut or another obstacle, they can steer around it. The shorter the preview time, the less information is obtained by a rider about distant conditions, obstacles and hazards.

Dr. Sloan also opines that once reaching the top of the mound and even after perceiving that the top of the mound had been shortened and that there was an edge looming, such a rider would not be warned that the edge ended in a

---

[13]It is undisputed that regardless of the direction from which they might have arrived at the mound initially, most dirt bikers made their runs for the top from the northwest end of the mound and then, until the time of the excavation, went over the top and back down to ground level over the southeast end of the mound. Plum Creek was fully aware of this. Mr. Larry Spear, Plum Creek's production superintendent, was himself a recreational dirt biker who often rode in the vicinity of the mound.

20-foot vertical drop, because "there is always the appearance of an edge when the slope [of a mound] changes at an angle greater than that from the rider's eyes to the point of change of the slope". Clerk's Papers, at 470.

Tennyson was able to bring his bike to a complete stop at the edge of the drop-off, but there was yet another latent aspect to this condition. There was a lip at the edge of the mound which obscured the steepness of the drop-off as viewed from the top of the mound. The lip was inadequate to support the weight of both the rider and his bike. Thus, Tennyson "quickly experienced the startling sensation of the front wheel of his bike breaking through the soil." Clerk's Papers, at 470. Dr. Sloan opines that Tennyson could not, while stopped at the edge of the drop-off, have perceived that the drop-off was as steep as it was or that the soil beneath his front wheel was as unstable as it was.

Dr. Sloan also points out that expectancy plays a large role in the ability of human beings to detect and respond to situations. He opines that the cliff was not readily apparent to Tennyson, until it was too late to save himself, due to a combination of expectancy (based on prior safe use of the mound), the lack of visual cues from the northwest end of the mound, the well-used trail leading to, and up and over, the mound, and the physical factors that made it impossible for one in Tennyson's position to detect the steepness of the cliff and the instability of the soil, from the top of the mound.

Finally, and as is also referred to elsewhere in the record as well, Dr. Sloan notes and finds it to be statistically significant in terms of both the dangerousness of the condition and its latency as to some users, that Tennyson was not the first dirt biker to approach the mound from the northwest and to ride up the northwest end of the mound only to fall over the edge of this cliff. Another young man who had also earlier safely ridden this same trail arrived from the northwesterly direction as did Tennyson, after the excavation was done. Like Tennyson, he rode his bike up the northwest end

of the mound. He and his bike went over the cliff. Unlike Tennyson, this other rider was able to get up and walk away afterward. Tennyson was not so fortunate. As the result of his fall, Tennyson is a permanent paraplegic.[14]

## DISCUSSION

It is undisputed in the record before us that Plum Creek knew about the artificial condition, knew that it was dangerous to dirt bikers, knew that some 2,000 dirt bikers swarmed in the vicinity of the gravel mound every weekend from April to October, knew that hundreds of those bikers were accustomed to riding on the mound, and knew that some bikers could and did reach the mound from the northwesterly direction on a roadway built by Plum Creek.

If it is generally true that a landowner need not "anticipate" the various ways that recreational users might use its property, majority at 556, it must also be true that the landowner cannot ignore that which it already knows about the ways that recreational users *are in fact* using the property, when it comes to the question of a duty to warn of a known, dangerous condition, and I would so hold.

By the terms of the recreational land use statute, a landowner who has opened his land to public recreational use without charging a fee and who knows about a dangerous, artificial condition that exists on the land need do only two things in order to secure statutory immunity for injuries by reason of the dangerous condition: (1) determine whether the condition is "latent" as that term is used in the statute; and (2) if it is, post a conspicuous warning sign to alert recreational users to the "not readily apparent" danger.

A latent condition is one which is not readily apparent to the recreational user. *Morgan v. United States*, 709 F.2d 580, 583 (9th Cir. 1983); *Van Dinter v. Kennewick*, 121 Wn.2d 38, 44-45, 846 P.2d 522 (1993). A person who takes

---

[14]Although the record reflects that this other rider fell before Tennyson did, it is not clear from the record whether Plum Creek learned about the other rider's fall before Tennyson fell, or only after the current litigation began.

advantage of the opportunity to use another's land for recreational purposes without paying a fee does so at his or her own risk, *except* that he or she is entitled to expect to be warned by means of a conspicuous sign of any manmade, dangerous condition on the property of which the landowner is aware and which is not readily apparent to the recreational user.[15]

Tennyson analogizes the well-worn dirt bike trail that led to and up and over the northwest end of the mound to a dirt road located on hypothetical recreational land. Unbeknownst to a recreational user who is traveling on that roadway, a deep pit has been dug in the roadway, just beyond a blind curve. The curve blocks the user's view of the pit, although the pit is clearly visible and thus readily apparent to a recreational user who is coming from the opposite direction. As to this hypothetical, Tennyson, Plum Creek and this court all agree: the pit in the roadway would be patent as to the user whose view of it was not obstructed, but latent as to the user whose view was obstructed by the blind curve, and it would not matter if *most* users of the road approached from the direction from which they could see the pit well in advance. Thus, it appears that a condition *may* be patent as to some recreational users but latent as to others. Why then, can that not be so with respect to this case? I think that it can.

---

[15]Tennyson testified that at a gravel pit near Bothell, Washington, where he had also gone dirt biking, and where trails led to the edge of the gravel pit, he had seen signs warning bikers and other recreational users when excavations at the pit resulted in steep drop-offs. As Tennyson put it during his deposition, these signs "seemed to work". Clerk's Papers, at 67. Ironically, where some landowners pay heed to the law and post warning signs as provided by the recreational land use act, the expectations of recreational users that other landowners will also obey the law may well be increased. By the majority's reasoning, however, the owner of the gravel pit near Bothell could remove the warning signs with impunity. No doubt a recreational user could see a dangerous excavation anywhere in the pit, simply by walking or riding all around the circumference of the pit, so as to view it from every angle. By the reasoning of the majority, it would seem that steep excavations at the Bothell site would be patent conditions as a matter of law.

The majority nevertheless disposes of Tennyson's analogy at page 556 n.4 of the majority opinion, by stating that Tennyson, who admitted at his deposition that he knew the gravel mound was a stockpile and that gravel can be removed from a stockpile at any time, *expected* the condition to occur, whereas a user on the roadway in the hypothetical example would not *expect* there to be a pit in the road. There are several problems with this reasoning, logically and jurisprudentially.

First, being aware that stockpiled gravel can be removed at any time is a far cry from expecting that if, as and when the gravel is removed, the mound will not be reshaped to its earlier symmetry,[16] especially when the mound is located on property where 2,000 dirt bikers are known to ride on each and every weekend between April and October. Expecting that stockpiled gravel can be removed at any time is a far cry from expecting that if, as and when the gravel is removed, there will be left a 20-foot, man-made cliff right in the middle of a well-worn, heavily traveled dirt bike trail which literally hundreds of dirt bikers are accustomed to using each and every weekend from April to October. Expecting that stockpiled gravel can be removed at any time is a far cry from expecting that if, as and when the gravel is removed and if, as and when a 20-foot man-made cliff is left in the middle of a well-worn bike trail, there will be no warning sign conspicuously posted, especially when the mound is the known and accustomed playground of hundreds of dirt bikers who come each and every weekend from April to October, and not all of them from the same direction.

What Mr. Tennyson truly "expected" is a disputed issue of fact. Dr. Sloan provides a rational explanation of why Tennyson and at least one other hapless biker "expected" nothing more on the days of their respective falls than what they had

---

[16]The undisputed evidence is that gravel mounds usually are made symmetrical, simply because that makes it easier to calculate the cubic yardage contained in the mound at any given time.

experienced before, a safe ride on the gravel mound. The majority has usurped for itself the role of the trier of fact in a case where reasonable minds can differ as to the latency of the dangerous condition to the recreational user who comes to the mound from the northwesterly direction. I believe that Tennyson's analogy to the pit in the road is apt. The well-worn trail leading to, up and over the northwest end of the mound looks very like a road. See appendix.

The question of whether a reasonable and prudent dirt biker would have taken the precaution of inspecting the mound from every angle before riding on it is a legitimate question, but not one that relates to the latency of the condition. Rather, if the trier of fact were to find that the known, dangerous artificial condition was also latent so that there was a duty to post a warning sign and a breach of that duty, there would next arise the issues of proximate cause and contributory negligence.[17] The trial court was not asked to address proximate cause and contributory negligence. These issues are not before us, either.

It is potentially misleading to say, as the majority does at page 555, that what a recreational user reasonably did or did not see has *no* bearing on whether a condition is latent. There is a relationship of sorts. Certainly if a condition is latent, it is not unreasonable for the recreational user not to have seen it. If it is patent, then, per se, it is unreasonable for the recreational user *not* to have seen it. It would be better to say that patency/latency is the *status* of being

---

[17]Tennyson understands this very well, and, contrary to the statement of the majority, at 555, Tennyson has never argued that the latency/patency issue depends upon whether he acted reasonably in riding up the mound. The majority misunderstands Tennyson's argument and quotes him out of context. It is Plum Creek which has continuously confused latency/patency with contributory negligence. Tennyson, in his reply brief, was merely pointing out the fallacy of Plum Creek's reasoning and arguing that if, but only if, this court were to accept Plum Creek's fallacious argument then it *would* follow that we could affirm the trial court only if we were to conclude that "no reasonable juror could conclude that Kevin Tennyson acted reasonably in riding up the well-marked path on the northwest slope of the gravel mound". Reply Br. of Appellant, at 3-4; majority, at 555.

readily apparent, or not, to the recreational user. If the condition is patent, the landowner is immune from liability and the inquiry ends. If the condition is latent and there is no warning sign, there may still be an issue as to the recreational user's contributory negligence but only for the purpose of determining the percentage, if any, by which the injured user's damages should be reduced. Any contributory negligence would not arise for failure to *see* the latent condition, but rather for acting in a given way or failing to act in a given way which could be deemed contributorily negligent. For example, if a reasonable dirt biker who had not ridden this mound in over a year would have checked in advance to be sure there was *not* a latent, dangerous condition lurking, before venturing onto the mounds, then Tennyson was contributorily negligent, but that is a separate issue from the latency of the condition. I believe that the majority understands the distinction intellectually, but stumbles into error in the course of actual application.

In this case, on the evidence presented I believe that a rational trier of fact could and probably would find the condition to have been latent as to Tennyson and other users approaching the mound from the northwest, and very well might find that dirt biking is the type of activity which would require a biker who had not ridden on the mound for 14 months to inspect the mound before riding it again — notwithstanding Dr. Sloan's testimony. Alternatively, a jury could find Dr. Sloan's testimony very persuasive, not only with respect to latency but also with respect to contributory negligence. The point is, it is not *our* task to weigh the evidence, but only to determine whether it raises genuine issues of material fact.

Believing that it does, I dissent. I would reverse as to Plum Creek and remand for a trial on the merits.

Review denied at 124 Wn.2d 1029 (1994).

APPENDIX