6 P.3d 1191 (2000)
Joseph Patrick DAVIS, Appellant,
v.
STATE of Washington, Respondent.
No. 24301-6-II.
Court of Appeals of Washington, Division 2.
August 25, 2000.
*1192 Glen Andrew Anderson, Asst. Atty. Gen., Olympia, for Respondent.
John Louis Messina, Jeffrey Howard Sadler, Messina Law Firm, Tacoma, for Appellant.
SEINFELD, J.
Joseph Davis seeks compensation from the State of Washington for the injuries he sustained when the motorcycle he was riding overturned. Davis had been riding at a state-owned recreation area. The trial court granted the State's motion for summary judgment, finding that the State was immune from tort liability under the recreational use statute, RCW 4.24.200 and .210. Davis argues *1193 that he followed motorcycle tracks in the sand leading to a drop-off and that the tracks constituted a known dangerous artificial latent condition for which the State is liable. We disagree and, thus, affirm.

FACTS
On May 27, 1995, Davis and two companions were riding motorcycles over the sand dunes at Beverly Dunes Recreational Area, a popular spot for off-road vehicle enthusiasts. The State owns and operates Beverly Dunes as a recreation zone, accessible free of charge to the public.
Davis claims he was following motorcycle tracks left in the sand by other riders when his vehicle suddenly and unexpectedly went over a drop-off into a bowl-like depression. He sustained serious permanent injuries in the fall and he subsequently filed this lawsuit against the State.
The State moved for summary judgment, asserting immunity from liability under RCW 4.24.200 and .210. In response, Davis argued for application of the statute's immunity exception. The exception holds owners of recreational lands liable for injuries "sustained to users by reason of a known dangerous artificial latent condition for which warning signs have not been conspicuously posted." RCW 4.24.210(3). There were no warning signs at Beverly Dunes.
The State supported its summary judgment motion with the declaration of James Munroe, the manager of Beverly Dunes. Munroe stated that the sand dunes had been left in their natural state; there had been no alterations made to them. He explained that the dunes are constantly shifting due to winds off the Columbia River and, as a natural result, the dunes typically have a gradual slope on the windward side and a steeper slope on the leeward side, where Davis's accident occurred.
The State contended that the condition that caused Davis's injury was the naturally occurring drop-off of the sand dune. It further claimed that the condition was neither artificial, latent, nor known by the State and, thus, the exception to the recreational use immunity statute did not apply.
Davis countered that the injury-causing condition was an "established trail" of tracks that led up to the deceptive drop-off in the sand dune. He argued that the condition was artificial, as the recreational vehicle tracks left by other riders had altered the land's natural contours. In support, he submitted several declarations and affidavits.
In an attempt to show the State's knowledge of the condition, Davis provided evidence of two earlier injury accidents at the same location, one in April 1995 and one in early May 1995. Although both were reported to local law enforcement, there was no evidence that State officials knew of the accidents.
Davis also produced evidence designed to show that the condition was "latent." According to several individuals, the drop-off was not visible to an approaching motorcyclist or a four-wheel recreational vehicle driver until it was too late to avoid going over the edge.
To establish artificiality, Davis provided affidavit testimony about tracks in the sand. Mathew Atterson, who accompanied Davis on the day of the accident, described the conditions as follows:
On May 27, 1995, ... [Joe Davis, Richard Riley and I] entered the recreational area to ride.
I believe there may have been a slight turn to the right from the campgrounds to enter the recreational area but, from then on, we headed straight. Initially, we experienced small bumps or ripples in the sand dunes. On the smaller bumps, the bikes would skip across them. There was the occasional sand hill, but they were not very big. We encountered the occasional desert plant. As we continued straight, we then encountered a wide open, fairly flat area. We continued to ride approximately 5 to 10 yards apart, sometimes closer and sometimes father apart.
We were following a distinct trail of tracks leading us straight. We were following this trail as I felt we were supposed to. I was riding slightly behind Joe who was to my left. Richard was to my right. When I looked ahead, it appeared that the *1194 trail was to continue straight and then I could see a rise in the distance. All of a sudden, I saw Richard become airborne. I immediately hit my brakes. At that moment, I saw Joe, who was more ahead of me than Richard, also become airborne. My bike went over the lip of the drop-off and skidded down to the bottom of the drop-off. From there, I could see that it was a bowl which then climbs up to the rise which I had been seeing just seconds before the drop off [sic]. We had all been looking at it and, because all we could see was flat sand, we were unable to detect that there was a drop-off in the middle.
Clerk's Papers at 87-88.
Davis recalled the incident in his own affidavit:
We then rode into the recreational area riding abreast of each other. I was riding in the middle of the other two. I recall the area as being relatively flat and mostly sandy with the occasional brush. The sand dunes were small, not bigger than 6 feet. Each of us would cut off slightly to the right or left but, for the most part, we kept each other in eyesight. There were not a lot of others riders, but on average I recall seeing a recreational vehicle every couple of minutes.
We encountered a wider open area which had a slight incline to it. I recall riding down the center of it. There were no dips or sand dunes in this particular area. It was straight riding and I was following tire tracks on a trail. I had been looking straight ahead and it appeared that this terrain was going to continue as a straightaway for quite some distance. All of a sudden, I saw that there was a drop off at the moment my bike became airborne and fell into what I call a sinkhole. I did not see the drop off until I was on the edge of it.
Clerk's Papers at 120-21.
Davis also submitted an affidavit from Robert J. Cunitz, a certified human factors professional, who attested:
In this case, I have reviewed photographs of the scene of the incident and surrounding area, taken on the day of the incident and two days after the incident. I have viewed a videotape, also taken two days after the incident, which shows the path taken by the plaintiff, Joseph Davis, leading up to where the incident occurred, the scene of the incident and the surrounding area. I have, also, reviewed incident reports for this and other incidents in the same location, as well as the declarations of Robin Hale, Julia Dunn and Todd Dunn.
In my expert opinion, the condition present at the Beverly Dunes Recreational Area was hidden to the reasonable recreational user. In particular, it is evident that there are many vehicle tracks leading up to the precipice where Mr. Davis became airborne and was injured. It is evident that a rider is led from the entrance of the recreational area by a path which brings the rider to the precipice without an opportunity to review or otherwise discover the hidden and camouflaged hazardous drop-off. It is hidden and camouflaged from view and is not readily discernable [sic] in time to avoid disaster by the ordinary prudent off-road vehicle rider who has not been alerted to the hazard.
It is clear from the videotape that there is a perception that there is no drop-off on the path and that the path appears to be a continuing level surface. This drop-off was completely camouflaged to the reasonably prudent recreational user.
Further, it is my opinion that the natural state of the area where the incident occurred has been changed. The area appears to have been modified by recreational vehicles which have created ruts and tracks leading directly to the drop-off.
The ruts and tire marks of the recreational vehicles gave the appearance of a delineated trail which lead [sic] to this hazard for which there was no warning. It is my expert opinion that the use of the area which created the trail made the area that much more dangerous and deceptive than if it had been left in its natural state.
Clerk's Papers at 83-84.
The trial court granted the State's motion for summary judgment, concluding that the injury-causing condition was not artificial. It framed the issue as "whether the use by *1195 other recreational users changes the condition of the property from natural to artificial." After reviewing the clause in the statute that describes the statute's purpose, the court held that the condition was not artificial as a matter of law.

DISCUSSION
When reviewing an order of summary judgment, we engage in the same inquiry as the trial court. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). The court must consider all the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Wilson, 98 Wash.2d at 437, 656 P.2d 1030.
If the plaintiff "fails to make a showing sufficient to establish the existence of an element essential" to his case, there can be no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Therefore, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 323, 106 S.Ct. 2548.

RECREATIONAL USE IMMUNITY STATUTE
The purpose of the recreational use immunity statute, RCW 4.24.200 and .210, is to "encourage owners or others in lawful possession and control of land and water areas or channels to make them available to the public for recreational purposes" and to protect owners of recreation areas who open their land to the public for recreational purposes from liability. RCW 4.24.200. To accomplish this purpose, the statute changed the common law by altering the entrant's status from that of a trespasser, licensee, or invitee to a new statutory classification of recreational user. Van Dinter v. City of Kennewick, 64 Wash.App. 930, 934-35, 827 P.2d 329 (1992), aff'd, 121 Wash.2d 38, 846 P.2d 522 (1993).
RCW 4.24.210 provides, in pertinent part:
(1) Except as otherwise provided in subsection (3) of this section, any public or private landowners or others in lawful possession and control of any lands ... who allow members of the public to use them for the purposes of outdoor recreation, which term includes ... pleasure driving of off-road vehicles... without charging a fee of any kind therefor, shall not be liable for unintentional injuries to such users.
. . . .
(3) ... Nothing in this section shall prevent the liability of such a landowner or others in lawful possession and control for injuries sustained to users by reason of a known dangerous artificial latent condition for which warning signs have not been conspicuously posted.
To trigger the exception to the statutory grant of immunity in subsection (3), each of the four elements  known, dangerous, artificial, and latent  must be present in the alleged injury-causing condition. Tabak v. State, 73 Wash.App. 691, 695, 870 P.2d 1014 (1994). Each of the elements modifies the term "condition," not one another. Ravenscroft v. Washington Water Power Co., 136 Wash.2d 911, 920, 969 P.2d 75 (1998) (citing Van Dinter, 121 Wash.2d at 46, 846 P.2d 522); Cultee v. City of Tacoma, 95 Wash.App. 505, 515-16, 977 P.2d 15, review denied, 139 Wash.2d 1005, 989 P.2d 1136 (1999).

I. Injury-Causing Condition
Initially, the parties dispute what factors constituted the "condition" that caused Davis's injuries. Under the recreational use immunity statute, the injury-causing condition is "the specific object or instrumentality that caused the injury, viewed in relation to other external circumstances in which the instrumentality is situated or operates." Ravenscroft, 136 Wash.2d at 921, 969 P.2d 75 (citing Van Dinter, 121 Wash.2d at 43, 846 P.2d 522). Because we cannot determine whether the injury-causing condition was latent, artificial, and known to the State without *1196 first specifying the object or instrumentality at issue, this is a critical question.
The State describes the injury-causing condition as the naturally occurring drop-off in the sand dune. Davis, citing Ravenscroft and Van Dinter, claims the condition included what he describes as "the established trail [of tracks] and the dangerous drop off [sic] on that trail."
The plaintiff in Van Dinter was injured when his eye struck an antenna on a piece of caterpillar-shaped playground equipment. 121 Wash.2d at 40, 846 P.2d 522. At the time of the accident, he had been engaged in a water fight on the grassy area next to the caterpillar. Van Dinter, 121 Wash.2d at 40, 846 P.2d 522.
Van Dinter claimed that the condition causing his injury was the proximity of the caterpillar to the grassy area. Van Dinter, 121 Wash.2d at 43, 846 P.2d 522. The defendant City argued that the injury-causing condition was the caterpillar. Van Dinter, 121 Wash.2d at 43, 846 P.2d 522. The court agreed with Van Dinter's characterization, stating:
To view the caterpillar or some part of it, such as the antennae, as having been the injury-causing condition would be to artificially isolate some particular aspect of the total condition that caused Van Dinter's injury. We also must give Van Dinter the benefit of every reasonable inference that can be drawn from the facts. Consequently, we hold that the condition that caused Van Dinter's injury was the caterpillar's placement, rather than the caterpillar as viewed in isolation.
Van Dinter, 121 Wash.2d at 44, 846 P.2d 522.
Similarly, the Ravenscroft court took a broad view of the injury-causing condition. The appellant in Ravenscroft was injured when the boat in which he was riding struck a submerged tree stump in an area of the Spokane River known as Long Lake. 136 Wash.2d at 915, 969 P.2d 75. The Washington Water Power Company (WWP) created Long Lake when it raised the elevation of the Long Lake reservoir. Ravenscroft, 136 Wash.2d at 915-16, 969 P.2d 75. When WWP did so, the trees along the banks became surrounded by water and were near the middle of the water channel. Ravenscroft, 136 Wash.2d at 916, 969 P.2d 75. Years later, after the trees had died, WWP had them cut, but the remaining tree stumps remained below the water's surface when the reservoir was at the maximum level. Ravenscroft, 136 Wash.2d at 916, 969 P.2d 75. The Ravenscroft court held that, although the specific object that caused the injury was the tree stump, it was necessary to view the stump in relation to other external factors, such as the location of the stump in the water channel and the water level. 136 Wash.2d at 921, 969 P.2d 75.
Here, if Davis were able to produce evidence of an artificial trail leading directly to a latent dangerous hazard, the trail would be part of the injury-causing condition. Although a cyclist might unexpectedly come upon the drop-off absent a trail leading to it, an established trail would suggest that the route it travels is an acceptable one. But, as we discuss below, Davis has failed to make a sufficient showing of artificiality, an element essential to his case, to defeat summary judgment.

II. Artificial Condition
Davis does not contend that the drop-off, part of the naturally occurring terrain, is artificial. Rather, he argues that the vehicle tracks constituted an artificial condition because they showed "efforts of man" that altered the "natural contours of the area." He further argues that the owner or possessor of the land need not have created the condition; users of the land may also create an artificial condition.
For purposes of the recreational use immunity statute, the meaning of "artificial" is the same as the dictionary definition of the word. Ravenscroft, 136 Wash.2d at 922, 969 P.2d 75. The dictionary defines "artificial" as follows:
contrived through human art or effort and not by natural causes detached from human agency: relating to human direction or effect in contrast to nature: (a): formed or established by man's efforts, not by nature[.]
*1197 WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 124 (1969).
We agree with Davis that, under certain circumstances, the presence of an artificial condition may be due to the efforts of persons other than the owner or possessor of the land. We do not agree, however, that the vehicle tracks here, apparently a by-product of recreational land users, constitute an "artificial" condition as RCW 4.24.210(3) uses that term.
Artificial means "contrived through human art or effort," and relating to "human direction," and "formed or established by man's efforts[.]" WEBSTER'S, supra, at 124. "Contrived" means "showing the effects of planning or devising." WEBSTER'S, supra, 496.[1] Given this definition, the situation here was not an "artificial condition" as RCW 4.24.210, a statute designed to encourage the opening of lands for recreational purposes, uses that term.
The evidence here indicates a transient print in the shifting sand left by a recreational user. The record does not show an established "trail" of any particular width, length, or time in existence; it merely indicates numerous vehicle tracks the day of the accident. Nor is there evidence suggesting that the tracks were a purposeful creation. The only reasonable inference is that they were an unintended consequence of off-road vehicle enthusiasts enjoying Beverly Dunes by riding their vehicles in the sand.
Holding landowners liable for unintended conditions that are an inherent and transitory by-product of a permitted recreational use would be inconsistent with the recreational use immunity statute's purpose of encouraging owners to make their lands available to the public by protecting them from liability. See RCW 4.24.200. Unlike Ravenscroft where the property owner created the dangerous condition, cutting the trees and then submerging them, and Van Dinter where the property owner placed the caterpillar antennae in a hazardous area, the property owner here lacked the ability to control or modify the alleged "artificial condition."
The only way to prevent tracks in the sand would be to prohibit the statutorily permitted use. And the only way to detect tracks in the shifting sand would be to conduct constant inspections. Under these circumstances, it would be inconsistent with the statute and unduly burdensome to require warning signs. To do so would make the statute's proposed immunity a sham.
Moreover, although Davis alleges that he and his two companions were following a trail, he also suggests that they were at times out of each other's eyesight, thus presumably not on a trail. Davis's expert, Robert Cunitz, referred to the "many vehicle tracks leading up to the" drop-off, describing that condition as a "path." But as Davis's counsel conceded at oral argument before this court, the photographs in the record show "tracks all over the place"; nothing in the record shows vehicle tracks going "from point A to point B." This is consistent with Munroe's testimony that, because of winds off the Columbia River, the dunes are "constantly shifting and are of a transitory nature."
Thus, Davis has failed to establish artificiality, an essential element of the exception to the recreational use immunity statute. Consequently, all other facts are immaterial. Celotex, 477 U.S. at 323, 106 S.Ct. 2548. On this basis alone, the trial court did not err in granting summary judgment to the State.

III. Known Condition
For purposes of the summary judgment motion, the trial court assumed that the injury-causing condition was "known," "dangerous," and "latent." The State concedes that the condition was dangerous, but it disputes that the condition was either "known" or "latent." We agree that Davis has failed to produce evidence showing that the State knew of the injury-causing condition.
To prove a "known" condition for purposes of the recreational use immunity statute, there must be evidence of the land-owner's *1198 actual, as opposed to constructive, knowledge that a dangerous latent condition exists. Cultee, 95 Wash.App. at 517, 977 P.2d 15. "Summary judgment is appropriate where a plaintiff presents no evidence that the landowner had actual knowledge of the condition giving rise to the plaintiff's injury." Cultee, 95 Wash.App. at 517, 977 P.2d 15.
Davis acknowledges the lack of direct evidence. He argues, however, that a trier of fact could reasonably infer actual knowledge from the circumstantial evidence. "Where actual knowledge is denied, a plaintiff must come forward with evidentiary facts from which a trier of fact could reasonably infer actual knowledge, by a preponderance of the evidence." Tabak v. State, 73 Wash. App. 691, 696, 870 P.2d 1014 (1994) (footnote omitted).
The situation here is distinguishable from that in Tabak, cited by Davis. In that case, the manager of the Lake Terrell Wildlife Area, Thomas Reed, became aware in March 1991 that the bolts holding two sections of a fishing float together were broken. Tabak, 73 Wash.App. at 693-94, 870 P.2d 1014. Reed had the broken bolts replaced, but disputed evidence in the record indicated that he became aware of further problems with broken bolts sometime during the next couple of months. Tabak, 73 Wash.App. at 694, 870 P.2d 1014. In May 1991, Tabak broke his leg when he tripped on an uneven area between the two sections of the float, apparently caused by broken bolts. Tabak, 73 Wash.App. at 694, 870 P.2d 1014.
At summary judgment, Tabak presented Reed's deposition testimony as circumstantial evidence of actual knowledge. Tabak, 73 Wash.App. at 696, 870 P.2d 1014. Reed had stated in his deposition that he learned that the bolts were broken sometime between February and May of 1991. Tabak, 73 Wash.App. at 696, 870 P.2d 1014. This statement was inconsistent with statements in his declaration in support of the summary judgment motion. Tabak, 73 Wash.App. at 696, 870 P.2d 1014. In his declaration, Reed had stated that the problem he learned of in early 1991 was repaired in March 1991 and that he did not learn of another problem with the float until June 1991. Tabak, 73 Wash. App. at 696, 870 P.2d 1014.
The court noted that conflicting statements on a material fact by the same witness preclude summary judgment. Tabak, 73 Wash. App. at 696, 870 P.2d 1014 (citing Powell v. Viking Ins. Co., 44 Wash.App. 495, 503, 722 P.2d 1343 (1986)). It then held that a rational trier of fact could reasonably infer actual knowledge from Reed's deposition testimony that he learned of broken bolts on the float sometime between February and May of 1991. Tabak, 73 Wash.App. at 696-97, 870 P.2d 1014.
Here, although Davis produced evidence of two other injury accidents at the same location where Davis's accident occurred, there is no evidence of the State's actual knowledge of those accidents. Nothing in the record indicates that the Sheriff's Department provided a copy of its report to the State or advised State personnel of the accidents.
Munroe was responsible for managing 13 recreation areas in southeastern Washington. Although he testified that he was familiar with the area in which the accident occurred and knew that the terrain could include dunes with steep slopes, there is no indication that he knew of this particular transitory condition. Thus, we find no basis to support a reasonable inference that the State had actual knowledge of the existence of a dangerous latent condition at the accident site.

IV. Latent Condition
The last challenged element is "latency." Here, the interpretation of the facts, not the facts themselves, are in dispute.
"Latent," as used in RCW 4.24.210(3), means "not readily apparent to the recreational user." Van Dinter v. City of Kennewick, 121 Wash.2d 38, 45, 846 P.2d 522 (1993). "The condition itself, not the danger it poses, must be latent." Ravenscroft v. Washington Water Power Co., 136 Wash.2d 911, 924, 969 P.2d 75 (1998) (citing Chamberlain v. Department of Transp., 79 Wash.App. 212, 219, 901 P.2d 344 (1995)). The dispositive question is whether the natural drop-off was readily apparent to the general class of *1199 recreational users. Ravenscroft, 136 Wash.2d at 924, 969 P.2d 75.
Davis submitted evidence that other users of the area, like Davis, thought the flat open area of sand they were traveling on continued into the distance. And Dr. Cunitz attested that, in his expert opinion, "there is a perception that there is no drop-off on the path and that the path appears to be a continuing level surface. This drop-off was completely camouflaged to the reasonably prudent recreational user."
The photographs in the record indicate that, on the day of Davis's accident, vehicle tracks covered the area in every direction. But apparently only Davis and his friends failed to notice the drop-off until it was too late to stop safely. Nonetheless, Davis has raised an issue of material fact as to whether the drop-off was perceptible to a rider coming from his direction.
Citing Tennyson v. Plum Creek Timber Co., 73 Wash.App. 550, 872 P.2d 524 (1994), the State contends that even if the drop-off was not visible to someone approaching rapidly on a motor vehicle, the condition was readily visible to anyone who stopped to inspect the area and, thus, was not latent. In Tennyson, Division One of this court found that an excavation on the back side of a gravel mound was not latent even though there were no visual cues to alert riders approaching from the northwest to the hazard. 73 Wash.App. at 555-56, 872 P.2d 524. The court held that the plaintiff should have anticipated that there could be a hazard on the far side of the mound and examined it as a whole before he rode over the top. Tennyson, 73 Wash.App. at 556, 872 P.2d 524.
Davis argues that Tennyson, which was decided before our supreme court decided Ravenscroft, may no longer be viable in light of the Ravenscroft holding. He also argues that Tennyson is distinguishable in that the plaintiff there ignored indications of danger. In Tennyson, the plaintiff was riding in an active excavation area and could have anticipated changes in the terrain. 73 Wash.App. at 555-56, 872 P.2d 524. By contrast, Davis contends that, as he did not have any such indication of danger, he had no reason to examine the area from different vantage points to check for dangerous conditions. The dissent in Tennyson argued that latency should be viewed from the plaintiff's perspective; the same condition might be latent to one and patent to another, depending on the viewer's vantage point. 73 Wash.App. at 565, 872 P.2d 524.
We agree with Davis on this issue. Here, there was nothing to alert a rider to a particular hazard, and the sand dune recreation area was open to cyclists who often travel at high rates of speed. Whether the drop-off was readily apparent to the general class of recreational users is a question of fact. Thus, the evidence of latency was sufficient to pose a jury question.
However, because Davis has failed to raise an issue of material fact as to all of the elements necessary to establish an exception to the recreational use immunity statute, we find that the trial court did not err in granting the State's motion for summary judgment.
Accordingly, we affirm.
ARMSTRONG, C.J., concurs.
HOUGHTON, J. (dissenting).
Under RCW 4.24.210, a landowner who opens up their land for recreational use free of charge is immune from liability except where a user is injured by a "known dangerous artificial latent condition for which warning signs have not been conspicuously posted[.]" Because I believe the human-made trail of tracks is an artificial condition and a trier of fact could reasonably infer the State had actual knowledge of the injury-causing condition, I respectfully dissent.
A. Artificial
In my view, the majority misconstrues the purpose of the artificiality prong and, in so doing, reaches a strained result. The majority deems a condition artificial only if the creator intended to create it. Because it reasons that recreational land users did not intend to create tracks while riding their vehicles on the sand dunes, the majority concludes the trail of tracks is not artificial. There are two flaws in the majority's analysis. *1200 First, the majority's premise that vehicle users lack "intent" to create tracks while riding their vehicles is completely unsupported by any evidence in the record. Second, and even more importantly, the majority misplaces the focus of the inquiry, which should be whether the condition that caused the plaintiff's injury was naturally occurring, i.e., detached from human efforts.
Under the recreational use statute, the meaning of "artificial" is the same as the dictionary definition. Ravenscroft v. Washington Water Power Co., 136 Wash.2d 911, 922, 969 P.2d 75 (1998). The dictionary defines artificial as follows:
1: contrived through human art or effort and not by natural causes detached from human agency: relating to human direction or effect in contrast to nature: (a): formed or established by man's efforts, not by nature[.]
WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 124 (1986).
Artificial is defined in contrast to that which is natural. Here, it is undisputed that the trail of tracks was not naturally occurring and did not appear on its own, but rather that it was the product of human effort and action. This is the essence of artificiality. The flaw in the majority's requirement that an artificial condition occurs only if the user intended to create the condition is readily ascertainable. Under the majority's reasoning, a camper who accidentally leaves a knife behind has not created an artificial condition because he or she did not have the requisite intent or purpose. Yet, few would dispute that a knife in the forest is an artificial condition, regardless of the creator's intent.
Because the trail of tracks that led to the drop-off was a human-made alteration to the sand dune's natural contours, I would hold the condition to be artificial.
B. Known
The majority holds there is insufficient evidence that the State had actual knowledge of tracks leading up to the sand dunes' leeward-side drop-off. I disagree.
The majority confuses the fact of actual knowledge with how it can be proven. "A plaintiff may establish any fact by circumstantial evidence." Tabak v. State, 73 Wash. App. 691, 696, 870 P.2d 1014 (1994). Circumstantial evidence is evidence of facts or circumstances from which the existence of other facts may be reasonably inferred from common experience. WPI 1.03. "Where actual knowledge is denied, a plaintiff must come forward with evidentiary facts from which a trier of fact could reasonably infer actual knowledge, by a preponderance of the evidence." Tabak, 73 Wash.App. at 696, 870 P.2d 1014.
Davis met his burden. He produced evidence of at least two prior injury accidents at the exact location where his accident occurred. The sheriff's department responded to, investigated, and prepared a report for each incident. In addition, James Munroe, a state employee who managed the Beverly Dunes, testified that he was familiar with both the area in which the accident occurred as well as the terrain in that area. From the foregoing, a reasonable jury could infer that Munroe knew that trails of vehicle tracks led to the sand dunes' unexpected drop-off.
Thus, charged with viewing the evidence in the light most favorable to Davis, I would hold that there is sufficient evidence from which a trier of fact could reasonably infer that the State had actual knowledge of the injury-causing condition.
In summary, a reasonable jury could find that the condition that caused Davis's injury was a human-made, dangerous condition that was not readily apparent to the general class of recreational users and which the State was aware existed. Consequently, I would reverse the trial court's summary judgment order and remand for trial.
NOTES
[1] Webster's defines "contrive" in part as "to fabricate as a work of art or ingenuity ... to form, shape, lay out or adapt by contrivance ... to bring about by stratagem or with difficulty." WEBSTER'S, supra, 496.