[No. 23536-6-II. Division Two. May 7, 1999.]

CHRISTINE CULTEE, *Individually and as Personal Representative*, ET AL., *Appellants*, v. THE CITY OF TACOMA, *Respondent*.

---

*David A. Nold* of *Inslee, Best, Doezie & Ryder*; and *Charles H. Williams*, for appellants.

*Jeffrey Frank Hale* of *Johnson, Graffe, Keay & Moniz*, for respondent.

HUNT, J. — Christine Cultee appeals summary judgment dismissal of her wrongful death action against the City of Tacoma for the death of her five-year-old daughter Reabecka, who drowned while riding her bike at Nalley Ranch. Holding that there are issues of material fact that preclude application of Washington's recreational immunity statute, we reverse and remand for trial.

## FACTS
### I. HISTORY

In 1992, the City of Tacoma purchased the Nalley Ranch, situated within the Skokomish Reservation in Mason County. A levee along the north edge of low-lying land on the east side of the ranch held back the waters of the Hood Canal.[1] To improve movement throughout the farm, the City rebuilt a series of elevated roads crisscrossing the property. While the levee was intact, the roads were untouched by the tidal waters outside the levee.

By resolution in 1994, the City opened most of its property to public recreational use, with the express purpose of invoking the protections of Washington's recreational use statute, RCW 4.24.210. The City operated the Nalley Ranch as a working farm until July 10, 1995, with an independent contractor raising and harvesting hay grown on the property. Two caretakers, Cindy and Robert Webb, lived on the property.

In December 1994, the Hood Canal levee broke and tidal waters flooded part of the east side of the farm at high tide. Although initially planning to repair the levee, the City decided to allow the affected part of the farm to return to its natural state. In the meantime, the City planned to

---

[1]The record does not indicate when the levee was built or by whom, but the levee predated the City's acquisition of the ranch.

install a gate on the west side of the farm to block access to the east side in order to protect both human beings and the environment. Nevertheless, members of the Skokomish Tribe were permitted to cross onto the east side of the farm to check their fish eddies; they generally used the so-called "Indian access road" to cross the east side of the farm.[2]

## II. DROWNING

Christine Cultee and her five-year-old daughter Reabecka had visited the Webbs at the Nalley Ranch caretakers' compound "once or twice" in the past. During these visits, Christine told Reabecka to "[s]tay around the house and don't go to the water" because Reabecka could not swim. Although Christine had not seen the destruction, she had heard Cindy and Robert talk about the tidal waters washing away most of the farm's roads. Cindy asserted she had previously told Christine that children were not allowed to go near the watery locations on the farm.

On June 23, 1995, Reabecka was visiting her grandfather, Lawrence Kenyon, who lived near the Nalley Ranch. Reabecka rode her bicycle to the farm with her cousins, 12-year-old Jesse Cultee and 10-year-old Darryl Kenyon; all three children were members of the Skokomish Tribe.[3] Jesse Cultee testified that the three children crossed the bridge to the east side of the farm and rode further into the farm property on the Indian access road.

At a point where there was no water on the road, the children stopped to check the water's depth along the side

---

[2]Before the levee broke, the Indian access road had not been surrounded by water.

[3]The ranch is located within the Skokomish Reservation. The west side of the farm abuts reservation land, while the east side of the farm is surrounded by water and accessible only by a bridge from the west side of the farm.

of the road and estimated it to be "two to five feet."[4] The children continued riding, not stopping until the road was covered by approximately two to four inches of muddy water. They rode about eight feet through the water on the road before dismounting their bikes to turn around. As Reabecka was mounting her bike, "she was too close to the edge and she fell in."[5] At this point the adjacent fields were flooded with several feet of water.

Neither Darryl nor Jesse could swim. Jesse tried to reach Reabecka, but he did not enter the water because it "looked too deep." Darryl rode his bike for help and reached Cindy Webb. Cindy headed for the site while Darryl called 911. She found Reabecka floating face down in the tidal waters. Although Cindy could get within a couple of feet, she did not enter the water to reach Reabecka because she did not know how to swim.

The ambulance crew traveled the last distance to Reabecka's location by foot and four-wheel drive rescue vehicle because they believed the road to be unsafe for the ambulance. The water in which Reabecka was floating was "over their heads[.]" By the time paramedics retrieved Reabecka from the water, she was "completely purple." They performed CPR but were unable to resuscitate her.

Jesse Cultee's account is partially contradicted by Cindy Webb's deposition testimony that shortly before Reabecka drowned: she had seen the children cross the bridge onto the east side of the farm and head down the Indian access road; she heard one of children comment that they should not be going down this road; she then saw them cross back

---

[4]Jesse offered this estimation, but later in his deposition, he indicated a misunderstanding between "feet" and "inches." Thus, it is unclear whether he meant "feet" or "inches" in describing the water's depth.

[5]Although Jesse and Darryl witnessed Reabecka's fall, neither explained more precisely why she had fallen. The parties speculate that she could have simply lost her balance, the moving water could have pushed her bike over, her bike tire could have slipped on the slimy mud on the road surface, or she could have stepped or rolled into a washed-out edge of the road as she attempted to start pedaling.

over the bridge; and she returned to the caretakers' house, without making contact with the children.[6]

Robert Webb also testified that he had seen the three children on the east side of the farm on the day of the drowning. He had stopped his car as he was leaving the farm and told them that they should not be on the east side of the farm and they should "go back to the bridge[.]" He claimed they did so. His story conflicts with both Jesse's account and Cindy's.

### III. WRONGFUL DEATH ACTION

Reabecka's parents, Christine and Kevin Cultee, filed separate wrongful death actions against the City.[7] The City defended on grounds that it was immune under the recreational use statute, RCW 4.24.210. Cultee responded that: (1) the recreational use statute did not apply because the Nalley Ranch was not open to the public for outdoor recreation; and (2) even if the statute did apply, the City was liable because the raised road, with its eroded edge hidden by the tidal waters twice daily, was a "known dangerous artificial latent condition for which warning signs [had] not been conspicuously posted." RCW 4.24-.210(3).

The City countered that the recreational use statute did apply and that the road covered by tidal waters was either a "natural" condition or an "artificial condition simulating a natural condition," precluding liability. The City also denied that the condition was "dangerous" or that it had "knowledge" of any dangerous condition. It contended that an issue of fact concerning its knowledge was not established by a letter from one of its employees, written more than two weeks before Reabecka's death; this letter

---

[6]The caretakers' house is located on the east side of the farm, south of both the bridge and the Indian access road.

[7]Christine Cultee brought an action on her own behalf and another action as representative of Reabecka's estate. Kevin Cultee brought an action as an individual. All three actions were consolidated at the trial court level. We refer to the plaintiffs collectively as "Cultee."

indicated that (1) the City's Public Utilities Department was planning to place a gate on its private road, near the Skokomish River, and (2) such a gate was "necessary for human safety and protection of the natural environment."[8] In the alternative, the City argued, if the statute did not apply, Reabecka was a trespasser and, under *Ochampaugh v. City of Seattle*,[9] the City was not liable for drownings of child trespassers.

The trial court granted the City's motion for summary judgment. The court did not rule on whether the recreational use statute applied. Rather, it ruled that, although there was a genuine issue of fact as to the statute's applicability, this factual dispute was not material: (1) If the statute did not apply, Reabecka was a trespasser and the City had no duty to warn, to prevent access, or to take affirmative steps under *Ochampaugh*; and (2) if the statute did apply, the tidal waters were a "natural" condition and, thus, the City was immune under RCW 4.24.210. The trial court denied Cultee's motion for reconsideration, and she appealed.

## ANALYSIS
### I. STANDARD OF REVIEW

■ In reviewing an order of summary judgment, we engage in the same inquiry as the trial court. *Ravenscroft v. Washington Water Power Co.*, 136 Wn.2d 911, 919, 969 P.2d 75 (1998) (*Ravenscroft II*).[10] Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

[8]The letter was written by Paul H. Svoboda, Natural Resources Manager at the Light Division of Tacoma Public Utilities; under the Tacoma City Charter, the Tacoma Public Utility Board has primary responsibility for overseeing land owned by the City. Tacoma City Charter, Section 4.10. No gate was ever installed on the farm, apparently because the Skokomish Tribe protested.

[9]91 Wn.2d 514, 588 P.2d 1351 (1979).

[10]For clarity, we refer to *Ravenscroft v. Washington Water Power Co.*, 87 Wn. App. 402, 942 P.2d 991 (1997) as *Ravenscroft I*, and *Ravenscroft v. Washington Water Power Co.*, 136 Wn.2d 911, 969 P.2d 75 (1998) as *Ravenscroft II*.

any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); *Degel v. Majestic Mobile Manor, Inc.*, 129 Wn.2d 43, 48, 914 P.2d 728 (1996). The facts and all reasonable inferences therefrom must be construed in the light most favorable to the nonmoving party. *Degel*, 129 Wn.2d at 48. Here, there exist genuine issues of material fact, bearing on whether the recreational immunity statute applies, such that summary judgment was not proper.

## II. APPLICABILITY OF RECREATIONAL USE STATUTE

Washington's recreational use statute, RCW 4.24.210, provides, in relevant part:

> (1) Except as otherwise provided in subsection (3) of this section, any public or private landowners or others in lawful possession and control of any lands whether designated resource, rural, or urban, or water areas or channels and lands adjacent to such areas or channels, who allow members of the public to use them for the purposes of outdoor recreation, which term includes . . . hiking, bicycling . . . without charging a fee of any kind therefor, shall not be liable for unintentional injuries to such users.
>
> . . . .
>
> (3) . . . . Nothing in this section shall prevent the liability of such a landowner or others in lawful possession and control for injuries sustained to users by reason of a known dangerous artificial latent condition for which warning signs have not been conspicuously posted. Nothing in RCW 4.24.200 and 4.24.210 limits or expands in any way the doctrine of attractive nuisance.

RCW 4.24.210.[11]

---

[11]Although the statute has been amended since June 23, 1995, the date Reabecka drowned, this amendment did not substantially change the "portions of the law which apply to this case, and the current version of the statute contains the same exception that was effective" when the incident occurred. *Ravenscroft* II, 136 Wn.2d at 919 n.2.

To determine whether the statute applies, we view the circumstances from the standpoint of the landowner or occupier. *Gaeta v. Seattle City Light*, 54 Wn. App. 603, 608, 774 P.2d 1255 (1989). "If he has brought himself within the terms of the statute," it applies regardless of individuals' purposes in coming onto the land. *Gaeta*, 54 Wn. App. at 608-09. But because there exist disputed issues of material fact, we cannot determine whether the statute applies here. It is not clear whether the City allowed: (1) general recreational users upon the farm as proclaimed by ordinance; (2) no recreational users, other than tribal fishermen, who might not be deemed "recreational"; or (3) a certain few persons to use the land in a recreational manner after obtaining explicit or implied permission.[12]

If the Nalley Ranch were open to the general public for recreational use, then the City would enjoy the statute's recreational immunity protection, unless there existed on the property a "known dangerous artificial latent condition[.]" RCW 4.24.210. In that case, the City would enjoy immunity only if it had posted conspicuous warning signs. If the statute does not apply, general negligence principles govern this lawsuit. Again, there exist too many issues of material fact for such decisions to be made without a trial.

### A. OPEN TO THE PUBLIC

The City argues that the statute applies because by its August 24, 1994, resolution, the City intended to obtain the protections of the statute for City properties such as Nalley Ranch by opening them for recreation: Properties "which are not designated or posted for restricted access or entirely fenced off or in any other way barricaded for

---

[12]If open to only a select few persons, the property would likely not be open to the "public" for purposes of the recreational immunity statute; to permit the City to shield itself from liability via the statute when only a select few recreational users were permitted to use the property would not comport with the Legislature's intent in approving the statute. *See Ravenscroft* II, 136 Wn.2d at 921.

limited use, are open for recreational purposes[.]"[13] *See* Tacoma City Substitute Resolution U-9024, adopted August 24, 1994.

But caretaker Cindy Webb testified that no one was allowed on the property except Indians during fishing season and that a member of the "general public" wishing to walk across the property would not be allowed to do so without first obtaining express permission from Tacoma City Light. Caretaker Robert Webb similarly indicated that only Indians with eddy rights[14] and the farming contractor's crews were allowed on the property. But he also indicated that this policy was not strictly enforced, especially with regard to members of the Skokomish Tribe.

Samuel Hildreth, who had been caretaker of the property from 1985 to 1993, explained that when the City took over the property in 1992, the City made clear to him that members of the general public were not allowed on the farm without the City's express permission. There were also "no trespassing" signs posted around the property.

Given the unresolved dispute over whether recreational users were generally permitted on the land, by virtue of the ordinance, or generally prohibited, by virtue of the no trespassing signs and caretakers' actions, it is impossible to say, as a matter of law, whether the recreational immunity statute applies.

### B. "KNOWN DANGEROUS ARTIFICIAL LATENT CONDITION"

 A landowner who has failed to post conspicuous signs warning of a "known dangerous artificial latent condition" enjoys no recreational statutory immunity for injuries caused by such condition. RCW 4.24.210(3). Each of these words—"known," "dangerous," "artificial," and "latent"—

---

[13]A City memo detailing the need for the 1994 resolution notes a then-recent claim where the statute was held inapplicable, despite signs indicating the property was open for recreational use, because "old Department communications indicated that limited use was desired."

[14]Eddy rights permit tribe members to fish with nets in the waters surrounding the east side of the farm.

modifies "condition." *Van Dinter v. City of Kennewick*, 121 Wn.2d 38, 46, 846 P.2d 522 (1993). Each element must be present before a landowner's duty to post a warning arises. *Ravenscroft* II, 136 Wn.2d at 920. Here, the existence of such a condition is in dispute. It is undisputed that the City posted no signs warning of the deteriorating condition of the roads on the east side of the farm or of the tidal waters sometimes covering parts of them.

For purposes of RCW 4.24.210(3) the "condition" is "the injury-causing instrumentality itself and its relatedness to the external circumstances in which the instrumentality is situated, or operates." *Van Dinter*, 121 Wn.2d at 43. To view the instrumentality alone "as having been the injury-causing condition would be to artificially isolate some particular aspect of the total condition that caused [plaintiff's] injury." *Id*. at 44. "Identifying the condition that caused [the] injury is a factual determination." *Id*.

The Washington State Supreme Court recently decided *Ravenscroft* II, in which the plaintiff was boating on a reservoir when his boat's motor struck a submerged stump and flipped into the boat, seriously injuring him. *Ravenscroft* II, 136 Wn.2d at 915. He sued the power company that maintained the reservoir. The trial court denied summary judgment to the power company, ruling that a jury must decide whether the injury-causing condition was "latent," and thus whether the power company would be afforded RCW 4.24.210's protections. Division Three reversed the trial court, holding as a matter of law that the injury-causing condition was the stump and that the condition was not "latent" because "[r]isks associated with natural bodies of water are deemed obvious and apparent." *Ravenscroft v. Washington Water Power Co.*, 87 Wn. App. 402, 413, 942 P.2d 991 (1997) (*Ravenscroft* I).

The Supreme Court reversed, holding that the injury-causing condition was not the stump itself, but rather the stump in combination with other factors, such as the location of the stump in the channel and the obscuring water

level. *Ravenscroft* II, 136 Wn.2d at 921-22. The court held that the injury-causing condition, examined in context, was an artificial condition as a matter of law. Because the record did not support a finding that the stumps were "obvious or visible as a matter of law," the court remanded for a jury trial on the issue of latency. *Ravenscroft* II, 136 Wn.2d at 926.

The City argues that the condition that resulted in Reabecka's death was merely water on the road and that this condition was not "dangerous," "artificial," or "latent." Cultee responds that the "condition" that resulted in Reabecka's death was the muddy water on the road, hiding the eroded road edge and steep drop off into deep adjacent water, in combination with deterioration of the raised road.

We disagree with the City's contention that "there is no evidence that the child fell because of the condition of the road itself." Although the record does not establish exactly why Reabecka fell over into the deep water, reasonable minds could differ as to the "condition" that caused her death. Thus, we cannot say, as a matter of law, that the condition that killed Reabecka was merely water on the road.

## 1. "KNOWN"

"In order to constitute a 'known' dangerous condition for purposes of the recreational use act, the landowner must have actual as opposed to constructive knowledge that a condition is dangerous." *Gaeta*, 54 Wn. App. at 609. Summary judgment is appropriate where a plaintiff presents no evidence that the landowner had actual knowledge of the condition giving rise to the plaintiff's injury. *See, e.g., Ertl v. Parks & Recreation Comm'n*, 76 Wn. App. 110, 115, 882 P.2d 1185 (1994).

Unlike Ertl, Cultee presented evidence that the City had actual knowledge of the injury-causing condition on its land: The City admits it knew that tidal waters sometimes covered roads at the Nalley Ranch. The City also knew that conditions on the farm were dangerous, and it planned

to install a gate across the private road leading to the bridge to the east side of the Nalley Ranch, acknowledging that such work was "necessary for human safety and protection of the natural environment."[15]

Furthermore, other City employees were aware that tidal waters were eroding the roads throughout the farm. Caretaker Cindy Webb had wanted to erect warning signs to "keep people from getting hurt or getting stuck." Similarly, her husband, Robert, observed,

> there are dangers out there. There's a lot of holes out there in that property with water that you can't see it. You could be walking ankle deep and all of a sudden go over your head.

Robert also indicated that when he went to the site of the drowning a couple of hours later, the road surface at the site was "slippery" and that every time he "went out there it was always under water or wet" and slippery.[16] Cultee has presented sufficient evidence to raise a question of material fact as to whether the City knew of dangerous conditions on the farm and whether those dangerous conditions caused Reabecka's death. These are questions of fact for the jury.

### 2. "Dangerous"

The evidence cited above raises questions of fact about whether the City knew, not only about the deteriorating road conditions at the farm, but also about the dangers they posed. In the absence of a statutory definition, a condition that poses an unreasonable risk of harm is "danger-

---

[15]Paul Svoboda, the writer of the letter (about the City's plans to install a gate three weeks before Reabecka drowned), later signed an affidavit explaining that he had been referring only to the risk of harm to humans if the bridge failed to support the weight of vehicular traffic. Nonetheless, a jury should assess Svoboda's credibility, especially in light of his admission that vehicular traffic would still have been allowed to cross the bridge even if a gate had been installed.

[16]Similarly, Cultee refers to depositions and declarations not included in the record, but undisputed by the City, identifying other City employees who knew of the dangerous conditions on the east side of the farm. Such evidence presumably would be available for consideration by the trier of fact.

ous." *Gaeta*, 54 Wn. App. at 609. Here, the road condition on the east side of the farm was "dangerous": Water moving in and over the property, combined with uneven, eroding roads, made it nearly impossible to move safely about the property. City employees, including the property's caretakers, had actual knowledge of the dangerous conditions. Local residents who visited the site immediately after the drowning found the conditions at the drowning site to be treacherous.

Speaking specifically of the drowning site, Cindy Webb opined that, although it would have been possible to cross through the water on the road to reach the dry spot where the road continued on the other side, it was not safe to do so. Lawrence Kenyon, Reabecka's grandfather, retrieved her bicycle after she drowned. He described the road at the drowning site as "clearly eroded" and noted that when the roads were covered with

> muddy water, the edge of the road is obscured and not visible. The sides of the [elevated] roads are steep, muddy[,] and slippery. In other words, it would be difficult to tell where the road began and where it ended because of the muddy tidal waters.

Again, Cultee has presented sufficient evidence to raise a question of material fact as to whether there were clearly dangerous conditions on the farm and whether they caused Reabecka's death. These, too, are questions for the jury.

### 3. "ARTIFICIAL"

Cultee argues that the trial court erred in finding that, if the statute applied, the condition that resulted in Reabecka's death was not "artificial" because it was either a natural condition or an artificial condition simulating a natural condition. The City relies heavily on *Ravenscroft* I for the proposition that the condition that killed Reabecka was natural as a matter of law. Given that *Ravenscroft* I was reversed on precisely this point, the City's argument is now largely unsupported.

██ Our Supreme Court had not defined "artificial condition" under the recreational use statute until *Ravenscroft II.* 136 Wn.2d at 920. The statute's limitation on liability applies both to artificially created recreation areas and to artificial structures located in natural areas. *Ravenscroft II,* 136 Wn.2d at 922.[17] Implicit in the court's holding is a differentiation between an "artificial condition" under the statute and an artificial structure or artificially created recreation area. The *Ravenscroft II* court rejected the defendant power company's assertion that imposing liability for the plaintiff's boat hitting a stump would be tantamount to ruling that the statute did not protect landowners whose property contained artificial bodies of water. "We want to make clear that the statute does not limit its grant of immunity to owners of 'natural' bodies of water or of land that remains only in its 'natural' state." *Ravenscroft II,* 136 Wn.2d at 921. The nature of the water body or land, on which an accident occurred, is irrelevant. Determining whether a particular condition is "artificial" turns upon "whether the exception to the statute applies to the particular condition which caused the accident. The focus here is whether the *injury-causing condition* is artificial." *Ravenscroft II,* 136 Wn.2d at 923 (emphasis added).

The "determination of whether a condition is dangerous, artificial and latent is often fact specific." *Ravenscroft II,* 136 Wn.2d at 923. In *Ravenscroft II,* the injury-causing condition was not merely the stump, but the stump in combination with the water covering it. The court found that a tree stump, by itself, "may be no more artificial than a large rock." 136 Wn.2d at 923. But a tree stump, in combination with the man-made condition of expansion of the water channel that causes the stump to be covered by water, is an "artificial" condition as a matter of law.

Here, the injury-causing condition could be characterized as the combination of an eroding man-made raised road,

---

[17]*See also Chamberlain v. Department of Transp.,* 79 Wn. App. 212, 901 P.2d 344 (1995) (statute applies to scenic overlook bridge); *Gaeta,* 54 Wn. App. 603 (statute applies to tracks on a roadway crossing the top of a dam).

muddy water hiding the road's irregular edges, and abutting deep water caused by tidal flows through an unrepaired hole in a man-made levee. Under *Ravenscroft* II, this aggregate condition is not "natural" in the same way that tidal waters regularly flood and ebb along natural beaches and adjacent low lying areas. Rather, the interplay between the Nalley Ranch and the tidal waters of the Hood Canal appear to have been artificially altered when man: (1) built the levee to hold back the tidal waters from the low-lying farm; (2) constructed steep-sided elevated roads across the farm; (3) failed to repair the hole in the levee through which tidal waters flooded the farm and roads;[18] and (4) failed to maintain the farm's roads in good repair and safe condition. Once an artificial condition such as a road has been constructed, persons travelling on that road have a reasonable expectation that it will be passable and free of invisible dangerous natural conditions, such as undermining or washouts. So, too, would the children or others travelling the roads on the east side of the farm reasonably expect that they could cross through the water on the road to reach the dry road on the other side.

Furthermore, under *Ravenscroft* II, it cannot be said as a matter of law that this condition was an artificial condition simulating a natural condition: Raised, partially submerged roads generally are not a natural condition. Depending on what "condition(s)" the jury finds caused Reabecka's death, either the "condition" was "artificial" as a matter of law or there is a genuine issue of material fact as to whether the condition was "artificial." Either way, summary judgment was inappropriate.

### 4. "LATENT"

■ A "condition is 'latent' if not readily apparent to the general class of recreational users. What a particular user sees or does not see is immaterial." *Widman v. Johnson*, 81

---

[18]Although over time the unrepaired hole in the levee might encourage restoration of the area to its pre-levee natural condition, such restoration was not complete at the time of Reabecka's death.

Wn. App. 110, 114, 912 P.2d 1095 (1996) (footnotes omitted).[19] The dangerous condition itself must be latent; a landowner will not be held liable where a "patent condition posed a latent, or unobvious, danger." *Van Dinter*, 121 Wn.2d at 46. Stated another way, "the question is whether the *injury-causing condition*—not the specific risk it poses—is readily apparent to the ordinary recreational user." *Ravenscroft* II, 136 Wn.2d at 925. An *obvious* defect cannot be "latent." *Chamberlain v. Department of Transp.*, 79 Wn. App. 212, 220, 901 P.2d 344 (1995).

■■ Latency is a factual question, which must usually be decided by a jury. But " 'when reasonable minds could reach but one conclusion from the evidence presented, questions of fact may be determined as a matter of law, and summary judgment is appropriate.' " *Van Dinter*, 121 Wn.2d at 47 (quoting *Central Wash. Bank v. Mendelson-Zeller, Inc.*, 113 Wn.2d 346, 353, 779 P.2d 697 (1989)). The *Ravenscroft* II court found that the record did not support the *Ravenscroft* I court's holding that underwater stumps in a reservoir are "obvious or visible as a matter of law." 136 Wn.2d at 926. Witnesses noted that other boats had hit stumps; thus, the condition was "not readily apparent" and the "question of whether this particular condition is latent is one of fact and, therefore, an order of summary judgment is not appropriate on that issue." 136 Wn.2d at 925-26.

Similarly, witnesses here indicated that the condition was "not readily apparent." The City has argued that Jesse Cultee's testimony irrefutably establishes that the "condition" was obvious. But much of the City's argument is based upon its erroneous contention that the condition that killed Reabecka was, as a matter of law, merely water on the road, and nothing else. The City also stresses Jesse's observation that Reabecka was "too close to the edge and

---

[19]*See also Tennyson v. Plum Creek Timber Co.*, 73 Wn. App. 550, 555, 872 P.2d 524 (1994) ("We believe that the dispositive question is whether the condition is readily apparent to the general class of recreational users, not whether one user might fail to discover it.").

she fell in," implying that Jesse could clearly see the edge and knew where it was. We disagree.

First, Jesse did not say that it had been obvious to him, before the incident occurred, that Reabecka was too close to the edge. He simply indicated that, after she fell and her bike disappeared into the tidal water, it became clear that she had been too close to the edge. Second, the City ignores a central issue here—whether a "general class of recreational users" would have been able to see the edge of the road, given that it was eroded and covered with a two-to-four-inch layer of muddy water. Jesse does not precisely explain how Reabecka fell in. He says simply that "somehow she must have fallen in."

Likewise, the City makes much of Jesse's statement that he did not jump in after Reabecka because the water "looked too deep." This, the City argues, establishes that the condition was "obvious." Again, there are questions of fact concerning whether the condition that killed Reabecka was the depth of the water alone, or a combination of the muddy water obscuring the eroded edge of the road and an abrupt drop into deep water.[20] Moreover, Jesse did not say that he *observed* that the water was too deep. Rather, once Reabecka fell into the water, he realized the water was deep, and, as a child who could not swim, he did not think he could help by jumping in after her.

The City's attempt to isolate various elements of the "condition" that resulted in Reabecka's death ignores the court's duty to examine together all aspects of the "condition" before deciding if the condition was either latent or patent as a matter of law, or a jury question. *See Ravenscroft* II, 136 Wn.2d at 924-26. If the Nalley Ranch was open to the public for recreational use, such that the statute applies, a genuine issue of material fact as to latency remains and summary judgment was inappropriate.[21]

---

[20]Again, a jury must decide what the "condition" was that killed Reabecka.

[21]Given that the bridge provided the sole entry onto the water-surrounded east side of the farm, it could have been easy for the City to post a sign warning of the dangers found on the east side of the farm as a result of the levee breach.

## III. Negligence Liability
### A. Premises Liability

██ ██ If RCW 4.24.210 is inapplicable in this setting, general premises liability principles apply. A cause of action for negligence requires the plaintiff to establish four elements: (1) the existence of a duty owed; (2) breach of that duty; (3) injury resulting from that breach; and (4) a proximate cause relationship between the breach and the injury. *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 127-28, 875 P.2d 621 (1994). The threshold determination, whether a duty exists, is a question of law. *Degel*, 129 Wn.2d at 48. "The existence of a duty may be predicated upon statutory provisions or on common law principles." *Id.* at 49.

██ Under Washington's common law, a landowner's duty of care to persons on his or her land is governed by the entrant's common law status: invitee, licensee, or trespasser. *Id.* Generally, a landowner owes no duty to a trespasser, except to refrain from willfully or wantonly injuring the trespasser. *Ochampaugh v. City of Seattle*, 91 Wn.2d 514, 518, 588 P.2d 1351 (1979). With regard to licensees,

> A possessor of land is subject to liability for physical harm caused to licensees by a condition on the land if, but only if,
>
> (a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and
>
> (b) he [or she] fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and

Although the City considered putting a gate across the road leading to the bridge, it never took that precautionary measure, nor did it put up a warning sign. Under RCW 4.24.210(3), a landowner will not be held liable for a known dangerous artificial latent condition where the landowner has posted conspicuous signs warning of the danger. Because the City never posted signs, if, upon remand, the statute is found to be applicable and the condition that killed Reabecka is found to be a "known dangerous artificial latent condition," the City may be liable.

(c) the licensees do not know or have reason to know of the condition and the risk involved.

*Tincani*, 124 Wn.2d at 133 (citation omitted).

The City argues that Reabecka was a trespasser and, thus, its only duty was to avoid "wilfull and wanton injury" to her. Alternatively, the City argues that, even if Reabecka were a licensee, the condition that killed her was "open and apparent" and thus factor (c) above is not met. The City cites *Swanson v. McKain*, 59 Wn. App. 303, 311, 796 P.2d 1291 (1990), in which we held that "risks associated with natural bodies of water are open and apparent" and, as a matter of law, are "conclusive on the issue of whether or not a licensee should be deemed to know, or have reason to know, of such risks." We concluded that "natural conditions constitute 'obvious and apparent' dangers as a matter of law, precluding liability on the part of a possessor toward a licensee." *Swanson*, 59 Wn. App. at 314. But this holding in *Swanson* was expressly overruled by *Tincani*, in which the Supreme Court noted, "[W]e disagree with *Swanson* that natural conditions constitute open and apparent dangers as a matter of law." 124 Wn.2d at 135. The *Tincani* court found that the phrase "open and apparent"

> assumes knowledge on the part of the licensee. Whether a natural hazard is open and apparent depends on whether the licensee knew, or had reason to know, the full extent of the risk posed by the condition. That is a question of fact.

124 Wn.2d at 135.

Reabecka could be considered a trespasser only: (1) if the Nalley Ranch was not open to the public as recreational land, contrary to the City's initial contention that the land was open to the public, thereby endowing the City with statutory recreational use immunity; and (2) if Reabecka did not have some other form of permission to be on the land. As noted earlier, there exists a question of fact

concerning whether the Nalley Ranch was open to the public; whether Reabecka was a trespasser hinges in part on the answer to that factual question.[22] Accordingly, we hold that the trial court erred in ruling as a matter of law that Reabecka was a trespasser.

## B. ATTRACTIVE NUISANCE

 Cultee further argues that Reabecka's common law status as either licensee or trespasser is irrelevant because the attractive nuisance doctrine applies.[23] Concern for the welfare and safety of children led to the development of this doctrine. *Ochampaugh*, 91 Wn.2d at 518.

> Under the exception known as the attractive nuisance doctrine, if all elements are met, the landowner is liable for physical injury caused by artificial conditions to trespassing children when the landowner "fails to exercise reasonable care to eliminate the danger or otherwise to protect the children."

*Degel*, 129 Wn.2d at 51 (quoting *Ochampaugh*, 91 Wn.2d at 519). The following elements must be present to establish an attractive nuisance:

> (1) the instrumentality or condition must be dangerous in itself, that is, must be an agency which is likely to, or probably will, result in injury to those attracted by, and coming in contact with it; (2) it must be attractive and alluring, or enticing, to young children; (3) the children must have been incapable, by reason of their youth, of comprehending the danger involved; (4) the instrumentality or condition must have been left unguarded and exposed at a place where chil-

---

[22]Even if the farm were not open to the general public, there would be another issue of fact as to whether Reabecka was an invitee or licensee by virtue of her previous visits with her mother onto the site to visit the caretakers, or by virtue of her status as a member of the Skokomish Tribe.

[23]Cultee cites an unpublished decision of this court, *Crow v. City of Raymond*, No. 19136-9-II, 1996 WL 565906 (Wash. Ct. App. Oct. 4, 1996). The City argues, and we agree, that Cultee is not permitted to do so. RCW 2.06.040; *State v. Fitzpatrick*, 5 Wn. App. 661, 668, 491 P.2d 262 (1971); RAP 10.4(h).

dren of tender years are accustomed to resort, or where it is reasonably to be expected that they will resort, for play or amusement, or for the gratification of youthful curiosity; and (5) it must have been reasonably practicable and feasible either to prevent access to the instrumentality or condition, or else to render it innocuous, without obstructing any reasonable purpose or use for which it was intended.

*Ochampaugh*, 91 Wn.2d at 518.[24]

In *Ochampaugh*, two boys drowned while playing in a pond on land owned by the City of Seattle. In affirming summary judgment for the city, the court held that, because the pond was either a natural body of water or an artificial body of water having natural characteristics, it could not in and of itself be an attractive nuisance. No evidence was presented that the pond was used for anything other than the activities that usually take place on a pond, and no evidence was presented that any particularly dangerous condition existed at this pond. "This court . . . has refused to extend the doctrine of 'attractive nuisance' to cases where children have drowned in a pond or other body of water having natural characteristics and no hidden dangers not ordinarily found in such bodies of water." *Ochampaugh*, 91 Wn.2d at 520. *Ochampaugh* focused on *how* the child enters the water: "[I]t is the pond of water which constitutes the danger, and the means by which the child chooses to enter it is immaterial, *assuming the accident is not caused by a*

---

[24]The City cites numerous drowning cases for the proposition that a body of water on the land is, as a matter of law, a natural condition, and thus cannot be an attractive nuisance. But none of these cases actually stand for such a broad proposition. All of these cited cases concern natural bodies of water, such as lakes or ponds; none address a situation like the one here, where tidal waters were eroding and partially submerging an operational raised roadway through a formerly dry area. The City's cited cases would apply if, for example, Reabecka, had drowned while playing in the surf on a beach, in which case the sea would be a natural body of water. Such is not the case here. The tidal waters flowing through a breach in the man-made levee onto the farm and roads might be characterized as a natural alteration of a man-made condition. But at the time of Reabecka's drowning, the tidal waters had not completed their incremental erosion by which the farm might ultimately return to its pre-levee natural state.

*defect in the instrumentality itself, or by a hazard which it conceals.*" 91 Wn.2d at 525-26 (emphasis added).[25]

In contrast, here, a slippery eroding road, partially covered and obscured by muddy tidal waters, flowing over what was once dry land, is neither a natural body of water nor a body of water without hidden dangers. Moreover, there is no evidence that Reabecka *chose* to enter the water; rather, there is evidence that her entry into the water was caused by a hazard concealed by the water. Unlike a pond, which involves a *possibility* of injury or death, an eroded road covered by tidal waters could be found to present a "likelihood or probability of such harm." *Ochampaugh*, 91 Wn.2d at 526.

The elements of attractive nuisance are potentially met here. First, "the instrumentality or condition must be dangerous in itself": A jury could find that the eroded road covered by tidal waters posed a "probability" of harming those who attempted to use it. Second, the condition "must be attractive and alluring, or enticing, to young children": A jury could find that children are drawn to riding bicycles through water on a roadway, especially during summer. Just as ponds are attractive to children " 'for the purposes of play, swimming, and fishing,' " *Ochampaugh*, 91 Wn.2d at 521 (citation omitted), a jury could find that water over a road would similarly attract children for purposes of play.

Third, the children must have been incapable, "by reason of their youth, of comprehending the danger involved." Reabecka was only five years old. We cannot say as a matter of law that she was capable of comprehending the danger posed by the eroded road elevated between deeply flooded adjacent fields, the edges of which were obscured by muddy water such that the roadway water was undifferentiated from the adjacent waters flooding the fields.

Fourth, the "condition must have been left unguarded and exposed at a place where children of tender years are

---

[25]*See also Degel*, reiterating that the attractive nuisance doctrine protects landowners "from the risk of liability to trespassing children who are injured by *natural* bodies of water." 129 Wn.2d at 54 (emphasis added).

accustomed to resort, or where it is reasonably expected that they will resort, for play or amusement, or for the gratification of youthful curiosity." Here, it is uncontested that the City neither erected a gate nor took other measures to keep children from accessing the eroding roads on the east side of the farm. There is also evidence that other children played on the farm, swimming and riding bicycles.[26] The farm is not far from a town. A jury could reasonably find that the City both knew and should have known that children might be playing on the roads on the east side of the farm.

Fifth, "it must have been easily practicable and feasible either to prevent access to the . . . condition, or else to render it innocuous, without obstructing any reasonable purpose or use for which it was intended." Here, there was only one entrance to the dangerous area, a bridge. Whether it would have been feasible for the City to have constructed a gate or to have posted warning signs at the entrance is a factual determination to be made by a jury.

Finally, the City cites *Ochampaugh*'s public policy statements about the importance of keeping Washington's miles of shoreline open to public access. But that public policy does not apply here. First, this case does not involve a shoreline; liability here would not lead to cutting off access to public waterways. Second, the body of water in *Ochampaugh* was a *natural* body of water; to have imposed liability in that case would have penalized an unwitting landowner for a completely natural condition posing no hidden danger. Here, a jury could find both that the City knew of a dangerous hidden condition, and that the condition cannot be considered natural under *Ravenscroft* II. Public policy does not require a finding that the City is immune from liability in this situation.

In sum, if the attractive nuisance doctrine applies, Reabecka's common law status is irrelevant. Because there is evidence that could meet all elements of the doctrine, a

---

[26]Apparently neither Reabecka nor her two cousins had ridden their bikes around the farm before the day she drowned.

jury would also need to decide liability. If the attractive nuisance doctrine does not apply, the jury must decide Reabecka's common law status. The jury must also decide liability, because evidence was introduced to satisfy all three elements necessary to establish a prima facie case of landowner liability for injury to a licensee: (1) The City knew of the danger posed by a condition on the land; (2) the City failed to exercise reasonable care to make the condition safe, or warn of the condition; and (3) Reabecka did not know or have reason to know of the dangerous condition. *See Tincani*, 124 Wn.2d at 133-34.[27]

## CONCLUSION

Regardless of whether the recreational immunity statute applies, summary judgment was improper under *Ravenscroft* II. First, if the statute is applicable, factual questions remain regarding what condition caused Reabecka's death and whether that condition was "known," "dangerous," "artificial," and/or "latent." Second, if the statute is inapplicable, a finder of fact must determine, among other things: (1) whether the attractive nuisance doctrine applies; (2) if so, whether the condition was "natural" or "artificial"; (3) if the doctrine applies and the condition was natural, whether the condition was "open and apparent"; (4) if the doctrine applies and the condition was artificial, whether the condition posed a "likelihood" of harm to children; and (5) if the doctrine does not apply, Reabecka's status—trespasser, licensee, or invitee—at the time of the incident. Because these issues and others are disputed and contested facts exist supporting both parties' positions, summary judgment dismissal was erroneous.

Accordingly, we reverse and remand for trial.

---

[27]Furthermore, as suggested in note 22 above, Reabecka might even have been an invitee.

ARMSTRONG, A.C.J., and HOUGHTON, J., concur.

Reconsideration denied June 3, 1999.

Review denied at 139 Wn.2d 1005 (1999).